UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION AT LAFAYETTE

| | |
|---|---|
| DAUGHTERY SPEEDWAY, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Cause No. 4:20-CV-36-PPS |
| | ) |
| MIKE FREELAND, STEVE COX, | ) |
| BRYAN BERRY, all Benton County | ) |
| Commissioners, BENTON COUNTY | ) |
| BOARD OF COMMISSIONERS, and | ) |
| DON MUNSON, Benton County Sheriff, | ) |
| both individually and officially, | ) |
| | ) |
| Defendants. | ) |

**OPINION AND ORDER**

Daugherty Speedway, Inc. is a dirt racetrack in Benton County, Indiana. It was ordered closed (along with a number of other businesses in Indiana) by virtue of Governor Eric Holcomb's executive orders relating to the COVID-19 crisis. The owners of the racetrack claim their property was seized without just compensation in violation of the Fifth and Fourteenth Amendments, and they also bring a variety of state law claims. The defendant in the case is not the Governor. Instead, the Plaintiffs have sued the people responsible for enforcing Governor Holcomb's orders—various county officials including the Benton County Sheriff and the County Commissioners. Those defendants now seek dismissal of the lawsuit. [DE 4, 17.]

After a telephonic conference conducted on November 17, 2020, the Plaintiff filed an Amended Complaint [DE 16] and the Defendants were invited to provide additional briefing or rely on their previous briefing. [DE 13.] Defendants filed a Notice on

December 11, 2020 [DE 17] stating their intention to rely on earlier briefing. Plaintiff did not file any responsive briefing. I take it from this that Plaintiff also intends to rely on earlier briefing. After reviewing the Amended Complaint and the earlier briefing by the parties, I will **GRANT** Defendants' Motion to Dismiss pertaining to the federal claims and relinquish jurisdiction to all state claims.

## Background

COVID-19, or coronavirus, is a pandemic "that has disrupted every aspect of public life." *Mays v. Dart,* 974 F.3d 810, 814 (7th Cir. 2020). The virus spreads easily through respiratory droplets, airborne transmission, and sometimes by contaminated surfaces, and the greatest risk of infection comes from those within six feet of another.[1] As of the date of this Order, over 653,000 Hoosiers have been infected with COVID-19 and over 12,000 Hoosiers have died from this virus.[2] In order to mitigate the spread of COVID-19, Governor Eric Holcomb issued multiple executive orders closing businesses and requesting citizens to remain at home.[3]

On May 1, 2020, Governor Holcomb grouped counties by their infection rates ranging from "Stage 1," which included the strictest limitations where only essential businesses may operate and asked residents to stay at home, to "Stage 5" with few restrictions. Exec. Order No. 20-26. As of May 4, 2020, Benton County moved to "Stage

---

[1] *How COVID-19 Spreads*, CDC, www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last visited Feb. 17, 2021).
[2] *Indiana Coronavirus Map and Case Count*, N.Y. TIMES (Feb. 17, 2021), www.nytimes.com/interactive/2020/us/indiana-coronavirus-cases.html
[3] Governor Holcomb's authority to issue executive orders derives from Ind. Code §§ 10-14-3-12(a), 10-14-3-22 and 16-19-3-9. Governor Holcomb's executive order further grants the Indiana State Department of Health with authority to oversee and coordinate emergency response activities with state agencies and local governments to "[d]o what is reasonable and necessary for the prevention and suppression of [COVID-19]." Exec. Order 20-02.

2," where social gatherings were limited to 25 people and sport and entertainment venues remained closed. *Id.* On May 22, 2020, Benton County moved to "Stage 3" where racetracks could reopen, subject to certain limitations. Exec. Order No. 20-28. On June 12, 2020, Benton County moved to "Stage 4," which allowed 50% capacity at racetracks and on July 4, 2020, Benton County moved to "Stage 4.5," further easing restrictions. Exec. Orders No. 20-32 and 20-35.

Daugherty Speedway, Inc. is a dirt racetrack in Benton County, Indiana. Because racetracks are not considered an essential business, racetracks were closed by executive order until July 4, 2020. Daugherty continued to operate and on May 6, 2020, the Indiana State Department of Health ordered Daugherty to stop operating through a cease and desist letter. [DE 16-1.] Undeterred, Daugherty continued operations and on May 8, 2020, law enforcement officers in Benton County blocked road access to the racetrack to prevent customers from attending races. [DE 16 at ¶¶ 22, 25.]

Although most of the Amended Complaint attacks the actions of Governor Holcomb and his decisions in attempting to stem the tide of the COVID-19 crisis, the Governor is no longer a defendant in this case; he was voluntarily dismissed. [DE 14, 15.] Instead, as noted above, Daugherty has chosen to sue the people who enforced the Governor's orders—the Benton County Board of Commissioners (and each of the three Commissioners) and the Benton County Sheriff. They are all sued both individually and officially for depriving Daugherty of his property in violation of the Fifth Amendment, as applied to the States through the Fourteenth Amendment and brought under § 1983 of the Civil Rights Act, and Indiana constitutional and common law claims. [DE 16.]

## Discussion

When considering a motion to dismiss for failure to state a claim, the complaint must state "a short and plain statement of the claim showing that the pleader is entitled to relief" and allege "enough facts to state a claim to relief that is plausible on its face." Fed. R. Civ. P. 8; *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Facial plausibility exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). "The purpose of a motion to dismiss is to test the sufficiency of the complaint, not to decide the merits." *Triad Assoc. v. Chicago Housing Authority*, 892 F.2d 583, 586 (7th Cir. 1989). At this early dismissal stage, I must "draw all reasonable inferences of fact in the non-movant's favor." *Gibson v. Am. Cyanamid Co.*, 760 F.3d 600, 605 (7th Cir. 2014).

First, I'll address Daugherty's argument that considering the executive orders would transform the motion to dismiss into a motion for summary judgment. For starters, at least one executive order is referenced in the Amended Complaint [DE 16] and multiple executive orders are referenced in an attached document. [DE 16-1.] Documents referenced or relied on to some degree by the complaint may be properly considered in a motion to dismiss. *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013) (stating that referenced documents are appropriate for consideration during a motion to dismiss when plaintiff cites them in the complaint or "to some degree, relied on their contents as support for [the] claims."). Because Daugherty referenced the executive orders in the Amended Complaint and attachment, considering them does not convert

4

this motion to dismiss into a motion for summary judgment. What's more, the Seventh Circuit has stated that "'the district court may also take judicial notice of matters of public record' without converting a 12(b)(6) motion into a motion for summary judgment." *Henson v. SCS Credit Servs.*, 29 F.3d 280, 284 (7th Cir. 1994) (citing *United States v. Wood*, 925 F.2d 1580, 1582 (7th Cir. 1991)). Because the executive orders that are germane to this case are part of the public record, I can also take judicial notice of them.

I begin by highlighting that Daugherty requests monetary damages and injunctive relief for its Fifth Amendment takings claim. However, the Fifth Amendment does not support this request for injunctive relief. *See Knick v. Twp. of Scott, Pennsylvania*, 139 S. Ct. 2162, 2176 (2019) ("As long as an adequate provision for obtaining just compensation exists, there is no basis to enjoin the government's action effecting a taking."). "The Fifth Amendment does not proscribe the taking of property; it proscribes taking without just compensation." *Williamson Cty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 194 (1985), *overruled on other grounds by Knick*, 139 S. Ct. 2162. The appropriate remedy for a taking under the Fifth Amendment is compensation in the form of damages and not injunctive relief. *Knick*, 139 S. Ct. at 2176. Therefore, I will dismiss the claims for injunctive relief and consider whether the Amended Complaint states a claim for which it may receive damages.

The Fifth Amendment, as applied to the States through the Fourteenth Amendment, prevents the government from taking property for public use without just compensation. U.S. CONST. amend. V, XIV. When an owner suffers a deprivation of his private property without just compensation, he "may bring his claim in federal court

under § 1983…" *Knick*, 139 S. Ct. at 2168. The Supreme Court outlined two types of taking: physical and regulatory. *See Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528 (2005). A physical taking occurs when the government appropriates or physically invades private property, whereas a regulatory taking occurs when the government regulation of private property is "so onerous that its effect is tantamount to a direct appropriation…" *Id* at 537. A regulatory taking may be categorical, which amounts to a total deprivation, or non-categorical, which is anything less than a total loss. *Id.* at 539-540.

Daugherty does not allege that it owns the blocked road. *See RDB Props., LLC v. City of Berwyn*, No. 20-1018, 2021 U.S. App. LEXIS 2629, at *5, 2021 WL 318235, at *2 (7th Cir. Feb. 1, 2021) (describing a claim that alleges a deprivation of parking on a public street where, in fact, plaintiffs did not allege ownership and in order to properly allege "[p]hysical encroachment in a per se taking claim[, the taking] must be on private property.") Rather, it alleges Defendants' actions in blocking the public road prevented it from holding races for two evenings. [DE 16.] The governmental action here was not a physical invasion of the property and so it was clearly not a physical taking. The question presented, therefore, is whether the governmental actions amount to a regulatory taking. Contrary to Daugherty's assertion in its briefing that the executive orders deprive it of all beneficial use of its property, I find that Daugherty has failed to allege a total loss in the value of its property. The temporary loss of profit does not equate to the alienation of all of Daugherty's property rights. Therefore, this alleged non-categorical regulatory taking will be analyzed under *Penn Central* and not *Lucas* or *Loretto*. *Lingle*, 544 U.S. at 537-39 (comparing *Penn Central Transp. Co. v. New York City*,

6

438 U.S. 104 (1987), *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992), and *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982)). *Penn Central* identified several factors: (1) "the economic impact of the regulation on the claimant," (2) "the extent to which it interferes with distinct investment-backed expectations," and (3) "the character of the government action" to determine when a regulation becomes a taking. *Lingle*, 544 U.S. at 538-39, *see also Penn Central*, 438 U.S. at 124.

The first *Penn Central* factor analyzes the economic impact of the regulation. Daugherty alleges it "lost roughly $50,000 in gross revenues for the two days of lost races" and does not allege a decrease in the property's value. [DE 16 at ¶ 28.] The complaint also fails to allege what Daugherty's profit would have been on the $50,000 in lost revenue. While "[t]he assets of a business . . . unquestionably are property, any state taking of those assets is a 'deprivation' under the Fourteenth Amendment. But business in the sense of *the activity of doing business*, or *the activity of making a profit* is not property in the ordinary sense" and Daugherty must claim more than Defendants' conduct frustrated a business enterprise. *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 675 (1999). Even when reading the Amended Complaint in the light most favorable to Daugherty, the economic impact of the regulation is limited to the activity of making a profit over the course of two days and does not extend to the numerous other rights Daugherty has in its property. Because Daugherty has only been temporarily deprived of income from its property, the economic impact of the regulation, at best, only slightly weighs in Daugherty's favor.

7

The second factor of *Penn Central* considers the extent the regulation interfered with distinct investment-backed expectations. In considering this, I turn to the value that has been taken away from Daugherty. Nothing alleged in the Amended Complaint enables me to "compare the value that has been taken from the property with the value that remains in the property." *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 497 (1987). "To plead a regulatory taking, [Daugherty] needed to point to some property right—not just some value—lost as a result of [Defendants'] actions." *RDB Props., LLC,* 2021 U.S. App. LEXIS 2629, at *7, 2021 WL 318235, at *3. The Amended Complaint is void of any facts showing a reduction in the total value of its property caused by the enforcement of the executive order and it does not claim the property is "commercially impracticable." *Keystone*, 480 U.S. at 495-98; *see also RDB Props., LLC,* 2021 U.S. App. LEXIS 2629, at *8, 2021 WL 318235, at *3, *see Leb. Valley Auto Racing Corp. v. Cuomo*, 478 F. Supp. 3d 389, 401 (N.D.N.Y. Aug. 11, 2020) (discussing that vague allegations of lost earning potential and the lack of customers in the stands rendered the property "not economically viable" or not "financially sustainable" without any discussion of diminished property value do not favor plaintiff).

Governor Holcomb's executive orders dealing with the COVID-19 pandemic are only a temporary disruption of business. This temporary delay in Daugherty's ability to effectuate economic use of its property is insufficient to constitute a taking. Daugherty's claims limit the impact of the regulation to only two days. In the grand scheme of things, two business days out of an entire year equates to a minimal interference with distinct investment-backed expectations. Daugherty fails to show the extent of the

8

regulation went "beyond consequential damages to the property value" and therefore, this second *Penn Central* factor does not weigh in Daugherty's favor. *RDB Props., LLC*, 2021 U.S. App. LEXIS 2629, at *10, 2021 WL 318235, at *4.

As for the final *Penn Central* factor, the character of the governmental action, I find that it strongly favors the Defendants here. Government action does not constitute a taking when "interference with the property rights . . . arises from a public program that adjusts the benefits and burdens of economic life to promote the common good," and where "the Government does not physically invade or permanently appropriate any of the [property] for its own use." *Connolly v. Pension Ben. Guar. Corp.*, 475 U.S. 211, 225 (1986). The temporary closure of non-essential businesses during a pandemic is a "public program adjusting the benefits and burdens of economic life to promote the common good." *Penn Central*, 438 U.S. at 124. Governor Holcomb, in his effort to keep Hoosiers protected amidst a pandemic issued a number of executive orders and through this authority, the Indiana State Department of Health issued cease and desist letters to businesses that were not considered essential by the executive orders. Non-compliance was met with enforcement by governmental authorities. These directives were intended to slow the spread of this deadly disease and protect citizens. Benton County followed state guidelines and attempted to shift the benefits and burdens of economic life in an effort to keep citizens safe. Given the gravity of the COVID-19 crisis, the Governor's response to it was both measured and entirely appropriate.

Also, recall that the character of the government action at issue in this case is not even the actions of the Governor. He's no longer a defendant, having been voluntarily

9

dismissed by Daugherty. Rather, what is at issue is the specific actions of the Benton County officials who were merely enforcing the Governor's orders. If the actions of Governor Holcomb were appropriate, and they plainly were, then certainly the actions of the local officials charged with enforcing those orders are on even sturdier ground. In all events, the final *Penn Central* factor overwhelmingly favors the Defendants.

Unsurprisingly, courts across the country agree that the final *Penn Central* factor, the character of the disputed government action during the COVID-19 pandemic, weighs heavily in Defendants' favor. *See e.g. Baptiste v. Kennealy*, 2020 U.S. Dist. LEXIS 176264, at *57-58, 2020 WL 5751572, at *22 (D. Mass. Sept. 25, 2020) (discussing the landlord-tenant relationship during the pandemic may burden landlords, but it also invariably protects tenants and others who "would be at greater risk of COVID-19 infection if displaced tenants caused or contributed to the overcrowding of other dwellings and homeless shelters, or were required to live on the streets"), *TJM 64, Inc. v. Harris*, 475 F. Supp. 3d 828, 839 (W.D. Tenn. 2020) ("The character of Defendants' actions and the context in which Defendants find themselves, here facing a national public health emergency, cut strongly against a finding that the COVID-19 Closure Orders amount to regulatory takings"), *Blackburn v. Dare Cty.*, 2020 U.S. Dist. LEXIS 168522, at *18-21, 2020 WL 5535530, at *8 (E.D.N.C. Sept. 15, 2020) ("[Defendant's] concededly legitimate exercise of its emergency management powers under North Carolina law to protect public health in the 'unprecedented' circumstances presented by the COVID-19 pandemic, [] weighed against loss of use indirectly occasioned by preventing plaintiffs from personally accessing their vacation home for 45 days, [] does

not plausibly amount to a regulatory taking of plaintiffs' property"), *Luke's Catering Serv., LLC v. Cuomo*, 2020 U.S. Dist. LEXIS 165907, at *34, 2020 WL 5425008, at *12 (W.D.N.Y. Sept. 10, 2020) ("Rather, the character of the government action here is a temporary and proper exercise of the police power to protect the health and safety of the community, which weighs against a taking"), *Pcg-Sp Venture I LLC v. Newsom*, 2020 U.S. Dist. LEXIS 137155, at *31-32, 2020 WL 4344631, at *10 (C.D. Cal. June 23, 2020) ("the Orders convert public health burdens into economic burdens, and reflect a judgment that the common good is best promoted by the protection of vulnerable members of society from a lethal and contagious disease, rather than the protection of some proprietary interests").

In sum, Daugherty does not allege the Defendants appropriated any of the racetrack for their own use or that Defendants' actions amounted to a complete taking or rendered its property economically unviable. *Connolly*, 475 U.S. at 225. Rather, the enforcement of the executive orders benefitted the general public, who would be at greater risk of contracting COVID-19 if congregating together in close proximity. The loss of anticipated profits for two days in this instance does not rise to the level of a taking under the Fifth Amendment. After balancing the three factors of the *Penn Central* analysis, I find the outcome overwhelmingly supports Defendants and that Daugherty has failed to adequately plead a regulatory taking under the Fifth Amendment. Therefore, this claim will be dismissed.

Based on my finding that Daugherty has failed to state a claim against Defendants, I do not need to consider the issue of whether Defendants were protected by qualified immunity. *Wos v. Sheahan*, 57 F. App'x 694, 697 (7th. Cir. 2002).

The final issue is what to do with the state law claims. District courts have discretion to decline exercising supplemental jurisdiction that they otherwise possess. 28 U.S.C. § 1367(c). One instance in which that may occur is when "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). In deciding whether to retain the case, a district court considers and weighs the "values of judicial economy, convenience, fairness, and comity." *Hansen v. Bd. Of Trs. Of Hamilton Southeastern Sch. Corp.*, 551 F.3d 599, 608 (7th Cir. 2008). Because the federal claims are being dismissed, the court will decline to exercise supplemental jurisdiction over Daugherty's state law claims. These claims will be dismissed without prejudice to Daugherty and it may bring them, if it chooses, in state court.

## Conclusion

For the reasons set forth above, Defendants' Motion to Dismiss [DE 4, 17] is **GRANTED**. The federal claim of a Fifth Amendment Taking by Defendants is hereby **DISMISSED WITH PREJUDICE**. The court relinquishes jurisdiction on all state claims, those claims are **DISMISSED WITHOUT PREJUDICE** and may be filed with the state court. The Clerk is DIRECTED to close this case.

SO ORDERED.

ENTERED: February 17, 2021.

/s/ Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT